UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WOODWARD HARBOR, L.L.C. and | * | CIVIL ACTION NO.: 2:23-cv-05824 |
| LSU HEALTH FOUNDATION | * | |
| NEW ORLEANS | * | JUDGE BRANDON S. LONG |
| | * | |
| VERSUS | * | MAG. JUDGE EVA J. DOSSIER |
| | * | |
| CITY OF MANDEVILLE and | * | SECTION "O" – DIVISION 3 |
| JASON ZUCKERMAN, INDIVIDUALLY | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## RESPONSE TO ORDER TO SHOW CAUSE
## BY MICHAEL R. C. RIESS AND JOHANNA ELIZABETH LAMBERT

Respectfully submitted,

*/s/ Steven F. Griffith, Jr.*
STEVEN F. GRIFFITH, JR. (La. No. 27232)
MATTHEW S. CHESTER (La. No. 36411)
BRIAN M. BALLAY (La. No. 29077)
MYLES H. SONNIER  (La. No. 39345)
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, PC**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
sgriffith@bakerdonelson.com
mchester@bakerdonelson.com
bballay@bakerdonelson.com
msonnier@bakerdonelson.com

**ATTORNEYS FOR**
**MICHAEL R. C. RIESS AND**
**JOHANNA ELIZABETH LAMBERT**

## Table of Contents

Introductory Statement  ................................................................................  1

I.    Explanation of the Source of the A.I. in the Joint Opposition.  ..............................  4

    A.    The History of the Working Relationship
          Between Riess LeMieux and Jones Fussell.   ...............................................  4

    B.    Division of Labor on the Subject Case.  ...................................................  5

    C.    Riess LeMieux's Involvement in the
          Drafting of the Joint Opposition.  ..................................................  7

    D.    The Complete Lack of Knowledge of the
          Use of Artificial Intelligence Use and the
          Rationale for Not Correcting the Record.  .................................................  9

    E.    Riess LeMieux's Policy Prohibiting the Use of AI.  ...................................  10

    F.    Riess LeMieux's Acknowledgment, Apology and Prevention Plan.  ...........  11

    G.    Respondents Offered to Pay Defense Counsels' Related Fees.  ...................  12

    H.    Respondents Have Never Been Sanctioned.  .................................................  12

II.   Rule 11 Sanctions of the Respondents
      Are Not Warranted in this Situation.  ........................................................  12

    A.    Sanctions Under Rule 11(b)(2) Are Not
          Warranted Here; Respondents Acted
          Reasonable Under the Circumstances.  ........................................................  13

        1.    Respondents' Review and Revisions to the
              Joint Opposition Was Reasonable Under the Circumstances.  .........  14

        2.    Respondents' Acted Reasonable Under the
              Circumstances Considering Their Lack of
              Knowledge of the Use of Artificial Intelligence
              and the Division of Labor.  ...............................................................  18

        3.    Respondents Understand the
              Significance of This Court's Order and
              Take Responsibility for Their Actions.  ...........................................  19

B.     Riess LeMieux has Already and Will Continue
       to Implement the Implement the Remedial
       Measures to Ensure This Will Not Happen Again.   ......................................   20

III.   Conclusion   ..............................................................................................................   22

## RESPONSE TO ORDER TO SHOW CAUSE
### BY MICHAEL R. C. RIESS AND JOHANNA ELIZABETH LAMBERT

NOW INTO COURT, through undersigned counsel, come Michael R. C. Riess and Johanna Elizabeth Lambert (collectively, "Respondents"), who respectfully respond to this Honorable Court's February 5, 2026, Show Cause Order.[1]  The Show Cause Order requires counsel to explain why they should not be sanctioned for failure to comply with Federal Rule of Civil Procedure 11(b)(2) by signing and filing a written motion without verifying the accuracy of the citations contained in the motion.

### Introductory Statement

Rule 11 obligations are non-delegable, under any circumstances.  The Respondents recognize their duties in that regard, and nothing contained within this filing is intended to suggest otherwise.  To the contrary, this submission is provided to the Court in an effort to explain candidly the circumstances surrounding the preparation and filing of the Joint Opposition to the City of Mandeville's Second Motion to Dismiss[2] (hereinafter, "Joint Opposition"), ultimately giving rise to the Show Cause Order.

The Respondents played absolutely no role whatsoever in the use of alternative intelligence or similar technology in the preparation of the Joint Opposition.  As is common with complex litigation involving different teams of attorneys at different law firms, and at the direction of their clients, the Respondents had a limited scope with respect to the preparation and filing of the Joint Opposition, only receiving a draft of it the day prior to its filing, and providing only high-level review for form and argument structure.  In fact, in that review, the Respondents did find some

---

[1] Rec. Doc. 103

[2] Rec. Doc. 97.

apparent errors in the briefing, suggested omission of an entire section of the draft as not pertinent to the legal issues, and communicated those issues to their co-counsel who then finalized the brief for filing with the Court.

Given that the Respondents' co-counsel was a well-respected, experienced subject matter expert on the issues being addressed in the Joint Opposition, and consistent with their clients' requests regarding allocation of resources between the law firms for the pursuit of the claims, however, they did not pull and review the cases cited in the draft. Again, this information is not provided to absolve them of any responsibility for the Joint Opposition – the brief was submitted with Mr. Riess's electronic signature by consent – but it is provided to respond fully to the Show Cause's Order's request for an explanation. And, with that explanation, Respondents unconditionally apologize to the Court, Defendants, and Defense Counsel.

Following the proliferation of generative artificial intelligence ("A.I."), the judiciary has encountered a litany of instances where attorneys submit pleadings to courts that contain hallucinated cases obtained from A.I. And, in the overwhelming majority of the matters in which sanctions are considered by the Court, the attorneys at issue had some role in the use of the A.I. Those cases are different from the circumstances in this matter.

First and foremost, Respondents did not employ the use of artificial intelligence nor did they know artificial intelligence was utilized when the brief was drafted by Respondents' co-counsel until after the Court's Show Cause Order. Second, and in accordance with their clients' directive, Respondents' role in the Joint Opposition was limited to a high-level review – which Respondents did perform – of the arguments due to Mr. Walker and Jones Fussell's expertise in the cross-over between zoning regulations and Section 1983 claims. For circumstances similar to the ones present in this matter – an attorney unknowingly signs a pleading drafted by co-counsel

who utilized A.I. "hallucinated" cases or erroneous quotes and citations – undersigned counsel is aware of four reported decisions with similar facts: [3]

- *Lexos Media IP, LLC, v. Overstock.com, Inc.,* No. 22-2324-JAR, 2026 WL 265581, at *17 (D. Kan. 2/2/26) (finding that attorneys, who neither drafted nor reviewed pleadings containing A.I. generated citation, acted unreasonable and issued sanctions in the form of a public admonishment and fines in the range of $1,000 to $3,000).

- *Shelton v. Parkland Health*, No. 3:24-CV-2190-L-BW, 2025 WL 3141108, at *3 (N.D. Tex. 11/10/25) (finding that a supervising attorney acted unreasonable for relying on a brief drafted by a new associate without verifying the citations therein, and issued a sanction of a public admonishment).

- *Mattox v. Prod. Innovations Rsch., LLC*, No. 6:24-CV-235-JAR, 2025 WL 3012828, at *8 (E.D. Okla. 10/22/25) (finding that attorneys were unreasonable by unquestioningly relying upon co-counsel, who drafted <u>eleven</u> pleadings with A.I. generated citation; they were publicly admonished and fined from $1,000 to $2,000, with one lawyer being barred from acting as a local counsel in lieu of a fine).

- *United States v. Cohen*, 724 F. Supp. 3d 251, 259 (S.D.N.Y. 2024) (declining to impose sanctions where counsel cited cases provided by another attorney with a renowned legal reputation).[4]

Each of these cases is discussed *infra*, and they all find at least some common themes with the Fifth Circuit's long-standing acknowledgement of the reality of the practice of law, particularly in complex litigation involving different firms:  an attorney's "reasonableness" requirement under Rule 11 can be satisfied by relying, to an extent, on another attorney's work-product.  *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 447 (5th Cir. 1992).  However, again the Respondents

---

[3] Undersigned counsel is aware of a fourth case where an attorney relied on someone else's work, but in *Dehghani v. Castro*, 782 F. Supp.3d 1051, 1055 (D.N.M. 5/9/25), an attorney *hired a third-party company* to draft a brief and did not read or verify the citations in the brief before filing.  The *Dehghani* court found it was unreasonable to rely on a vendor in that regard and imposed sanctions in form of a fine of $1,500, mandatory CLE training, self-reporting to multiple state bar associations, reporting the outsourcing company to that state's bar association.

[4] The standard applied by the *Cohen* Court is a subjective bad faith standard, which differs from the Fifth Circuit's reasonableness standard.  Nevertheless, *Cohen* provides a relevant framework in which to consider this matter.

acknowledge that there were a number of incorrect citations contained in the Joint Opposition that were not identified by Respondents, and they unconditionally apologize to the Court, Defendants, and Defendant's Counsel.

I.      **Explanation of the Source of the A.I. in the Joint Opposition.**

Again, Respondents provide the background below as an explanation, not an excuse, of the Respondents' involvement with the drafting of the Joint Opposition.  Simply, the Respondents did not utilize artificial intelligence, and the Respondents did not know it was utilized to draft the Joint Opposition.

A.      *The History of the Working Relationship*
*Between Riess LeMieux and Jones Fussell.*

The attorneys at Riess LeMieux have worked with Jones Fussell and its attorneys for decades, specifically on land use, zoning, and development in St. Tammany Parish.  Declaration of Michael R. C. Riess, dated 2/12/26, ¶ 5, attached as Exhibit "2."  Jones Fussell is well known to Riess LeMieux and the legal community as the preeminent firm on the Northshore for land use, zoning, and development.  *Id.* at ¶ 5.  According to its website, Jones Fussell is considered the "go-to" group to procure regulatory approval and/or entitlement from a local governmental body in connection with proposed land use and development.[5]  Jones Fussell and Riess LeMieux share mutual clients, who are landowners and developers in St. Tammany, and the law firms have coordinated and worked together on development deals and permitting issues on several occasions in the past.  *Id.* at ¶ 5.

As it relates to the specific attorneys working on the captioned matter, Tom Huval was an associate at House, Kingsmill, Riess (predecessor to Riess LeMieux) and worked closely with

---

[5] See https://www.jonesfussell.com/real-estate-and-land-use (last visited Feb. 10, 2026).

Respondent Michael Riess for approximately six to seven years in the 1990s.  *Id.* at ¶ 6.  While at Jones Fussell, on numerous occasions, Tom Huval and Michael Riess coordinated the representation of their respective clients in matters when they represented co-defendants as co-counsel.  *Id.* at ¶ 6.  Further, John Walker successfully represented a Riess LeMieux lawyer's family in a contentious land use dispute involving injunctive relief in St. Tammany known as "Favrotville."  *Id.* at ¶ 6.  In short, Riess LeMieux and Jones Fussell have worked together for years and in doing so gained a respect and trust of their respective work product and legal acumen.  *Id.* at ¶¶ 5, 6, and 13.

B.    <u>*Division of Labor on the Subject Case.*</u>

When the captioned litigation was initiated in October 2023, Riess LeMieux represented both Woodward and the LSU Foundation under a Common Interest and Joint Prosecution Agreement.  *Id.* at ¶ 7.  Riess LeMieux, along with input from Woodward's counsel (who represented it during the permitting process), drafted all pleadings, including the Complaint, three Opposition Memoranda, and an Opposition to a Supplemental Memorandum, found at Rec. Docs. 1, 28, 30, 35, 44, respectively.  *Id.* at ¶ 8.

On December 20, 2024, this Honorable Court issued an Order for a telephone status conference where the Respondents represented both Woodward and LSU Foundation. Rec. Doc. 46.  After the conference, an Order was issued for the parties to contact Magistrate Judge Dossier "for the purpose of scheduling a settlement conference that should occur in February 2025." Rec. Doc. 47.  In February 2025, it was determined that the LSU Foundation should be represented by separate counsel.  Ex. "2," Riess Decl. at ¶ 9.  Thus, on February 19, 2025, LSU Foundation filed a Motion to Substitute Counsel, enrolling John R. Walker and Thomas H. Huval of the firm of Jones Fussell, L.L.P. and withdrawing Michael R.C. Riess and Johanna Elizabeth Lambert of Riess

LeMieux.  Rec. Doc. 50.  The Motion was granted on the same day.  Rec. Doc. 52. The settlement conference was held in front of Magistrate Judge Dossier on February 24, 2025, but the parties were unable to reach a resolution.  Rec. Doc. 58.

Because Woodward and Riess LeMieux took the lead on early motion practice on behalf of both plaintiffs, after the settlement conference Woodward and the LSU Foundation agreed that Jones Fussell and the LSU Foundation would take the lead on drafting pleadings and arguing future motions.  Ex. "2," Riess Decl. at ¶ 10.  Riess LeMieux's role was to review Jones Fussell's work at a high level for form and argument structure.  *Id.* at ¶ 11.  Considering Riess LeMieux's longstanding working relationship with Jones Fussell and Jones Fussell's expertise in the area of law, Riess LeMieux had no concern regarding the capabilities of Jones Fussell or the quality of the work that would be generated on the issues before the Court.  *Id.* at ¶¶ 5, 6, and 13.  To be clear, there was no discussion that AI would be used to draft pleadings, and Riess LeMieux did not employ AI at any time as part of its work on the captioned matter.  *Id.* at ¶ 16.

As agreed, Jones Fussell took lead in drafting the Joint Opposition and Joint Supplemental Memorandum regarding the Intervention.[6]  *Id.* at ¶ 12.  Jones Fussell also drafted a Joint Opposition to a Motion for Attorneys Fees,[7] a Joint Opposition to a Motion for Extension of Time,[8] and the pleading at issue -- the Joint Opposition.[9]  *Id.* at ¶ 12.  For all motions filed jointly, as agreed to by Woodward and the LSU Foundation and understood by the law firms, Riess

---

[6] Rec. Docs. 67 and 72.

[7] Rec. Doc. 78.

[8] Rec. Doc. 96.

[9] Rec. Doc. 97.

LeMieux's role was to review and comment at a high level on form and argument structure. *Id.* at ¶ 11.

          C.     *Riess LeMieux's Involvement in the*
                  *Drafting of the Joint Opposition.*

As it relates to the pleading at issue, the Joint Opposition, Riess LeMieux received the first draft on the afternoon of June 2, 2025 at 2:21 p.m. *Id.* at ¶ 14. It was due for filing on June 3, 2025. *Id.* at ¶ 14. Ms. Lambert read the City of Mandeville's Motion, then reviewed the *draft* Joint Opposition for form and argument structure. Declaration of Johanna Elizabeth Lambert, dated 2/12/26, ¶ 15, attached as Exhibit "3." In reviewing the pleadings side by side, it was visibly apparent that a proposed section of the *draft* Joint Opposition entitled "C. The City Relies on Distinguishable Case Law" contained four cases not in the City of Mandeville's Motion. *Id.* at ¶ 15. However, two cases had been cited in the City of Mandeville's Motion: *Couf* was cited once and *Lindquist* was cited seven times. *Id.* at ¶ 15. Ms. Lambert notified her co-counsel, John Walker, that she could not find some of the cases in the Rule 12 Motion as seen below. *Id.* at ¶¶ 15 and 16.

| | |
|---|---|
| **From:** | Johanna Elizabeth Lambert <jlambert@rllaw.com> |
| **Sent:** | Tuesday, June 3, 2025 1:26 PM |
| **To:** | 'johnwalker@jonesfussell.com' |
| **Subject:** | RE: Activity in Case 2:23-cv-05824-BSL-EJD Woodward Harbor LLC, et al v. City of Mandeville, et al Motion to Dismiss/Failure to State a Claim/FRCP12(b)(6) |
| **Attachments:** | LSU Joint Memorandum in Opposition to Second Motion to Dismiss RL Rev.docx |

John:

See attached for revisions.

FYI – only. I cut Section II(c) as I could not find some of the cases in the City's brief. Let me know if you want to discuss. See below.

Otherwise, we are ok with filing.

Thank you,
Liz

**C. The City Relies on Distinguishable Case Law**

The City relies on a series of cases that do not support dismissal under the facts alleged in his case.

*Couf v. DeBlaker*, 652 F.2d 585 (5th Cir. 1981) involved a facial constitutional challenge to a zoning ordinance, not an as-applied equal protection claim based on irrational treatment. *Shipp v. McMahon*, 234 F.3d 907 (5th Cir. 2000) involved sheriff's deputies and employment decisions, not land use or zoning, and was decided at the summary judgment stage, not on a 12(b)(6) motion. *Rotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812 (5th Cir. 2007) involved a First Amendment retaliation claim, decided on a different legal framework. Additionally, the 5th Circuit acknowledged that arbitrary and capricious conduct by government actors may give rise to equal protection claims. Plaintiffs here alleged targeted conduct, through denial of zoning approval, motivated by improper and irrational animus, including fabricated criteria and unequal treatment of similarly situated developments. *Lindquist v. City of Pasadena*, 669 F.3d 225 (5th Cir. 2012) dealt with an internal employment grievance and had no relevance to zoning procedures. *Kokinda v. Pa. Dep't of Corr.*, 803 F. App'x 574 (3d Cir. 2020) is a non-binding, factually distinct case involving a prison grievance process.

In contrast, *Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012), supports Plaintiffs' position. There, the court reversed summary judgment in favor of the City where plaintiffs alleged their land use application was denied for irrational reasons not applied to others. The court allowed a class-of-one claim to proceed based upon differential zoning treatment of a single property. That decision demonstrates the viability of class-of-one claims in zoning contexts where arbitrary treatment is alleged.

Johanna Elizabeth Lambert
Partner
**RL RIESS LEMIEUX**
1100 Poydras Street | Suite 1100
New Orleans, Louisiana 70163
P: 504.581.3300 | F: 504.581.3310
D: 504.619.6149| C: 318.452.5421
JLambert@RLLaw.com | RLLAW.COM

*See* Lambert Decl. at ¶ 16, and email correspondence between Lambert and Walker, dated 6/2/25, email attachment page 2.

Upon receipt, Mr. Walker responded: "Yikes good catch. I owe you lunch." Ex. "3," Lambert Decl. at ¶ 16. After Ms. Lambert's review for form and argument structure and revisions to correct what she reasonably believed was an inadvertent copy and pasting error from another brief, Mr. Riess conducted a review of the final draft before filing. *Id.* at ¶ 18; Ex. "2," Riess Decl. at ¶ 15.

Considering Jones Fussell's experience with zoning, land use, and development, the Respondents believed that the section that contained the cases that were not cited by the Defendants was inadvertently held over from another opposition to a Rule 12(b) motion where Jones Fussell represented a landowner or developer against a public entity (because the issues before the Court were not novel).

> D.   *The Complete Lack of Knowledge of the*
> *Use of Artificial Intelligence Use and the*
> <u>*Rationale for Not Correcting the Record.*</u>

Again, the use of artificial intelligence to draft the pleading was not disclosed to Riess LeMieux, even though co-counsel could have done so prior to filing. In fact, Riess LeMieux was not aware of the use of artificial intelligence until this Honorable Court's February Order. Considering Riess LeMieux's role to review and comment at a high level on form and argument structure, its lack of knowledge regarding the use of artificial intelligence to draft the brief, and its faith in and understanding of Jones Fussell's knowledge of the subject matter and stellar reputation, the issues raised by this Honorable Court were not apparent – and entirely unexpected – in the Opposition. To be clear, had it been disclosed to Riess LeMieux that artificial intelligence was used in drafting (or even assisted in the drafting) the Opposition, Riess LeMieux would not have joined in the pleading. Ex. "2," Riess Decl. at ¶ 18. Instead, Riess LeMieux would have submitted an independent pleading without the use of artificial intelligence. *Id.* at ¶ 18.

When the City of Mandeville's Reply was filed, the Motion was deemed submitted to the Court without the need for further briefing. As such, the Respondents, based on the limited scope defined by the client, did not read the Reply. *Id.* at ¶ 19. Email correspondence and billing records

from that time frame both confirm that fact.[10]  Certainly, the Respondents deeply regret their decision to rely on co-counsel and, as noted below, the firm has implemented steps to make certain that this situation never happens again.  *Id.* at ¶¶ 25, 28, 29, and 31. Riess LeMieux believed in the strength of the team and, considering its preexisting work relationship and experience with Jones Fussell, it had no reason to believe otherwise.  *Id.* at ¶ 31.  With the benefit of hindsight, and now knowing that A.I. was used was used in the Opposition, Riess LeMieux understands it should have done more and sincerely apologizes for its shortcomings and wasting this Honorable Court's and the Defendants' time and resources. *Id.* at ¶ 31.

E.    *Riess LeMieux's Policy Prohibiting the Use of AI.*

At the time the Opposition and Reply were filed, as a firm, Riess LeMieux was not using AI. Ex. "2," Riess Decl. at ¶ 20.  As an example, after a software update added an AI component Microsoft Teams for recording and transcription, Riess LeMieux notified all employees to disable the AI component to maintain privilege and ensure client information was not accessible to third parties or an "open" AI system.  *Id.* at ¶ 20.  Beginning in 2025, firm use of AI and how to implement it safely has been a standing topic discussed at partner meetings.  *Id.* at ¶ 21.  In October 2025, Joel Hron, Chief Technology Officer at Thompson Reuters, presented to Riess LeMieux on permissible use of Westlaw AI for research and drafting.  *Id.* at ¶ 22.   Riess LeMieux partners were also trained on how to use Microsoft Co-Pilot.  *Id.* at ¶ 23.  After research on what AI products to use and training on how to use them, Riess LeMieux currently allows certain attorneys to use Westlaw Co-Counsel, Westlaw Deep Research, and Microsoft Co-Pilot to better understand its capabilities, limitations, and how to effectively use these tools in its practice.  *Id.* at ¶ 24.  Riess

---

[10] Given privilege concerns, they are not submitted with this filing.  But, the Respondents stand ready to submit those documents to the Court *in camera* should the Court desire to see them.

LeMieux also has an AI policy, in draft form, that will be implemented in the next 4-6 weeks. *Id.* at ¶ 25. Importantly, Riess LeMieux's policy will now include a provision for documents drafted by co-counsel, certifications for primary drafters, and a process for review to confirm accuracy to ensure a similar situation does not happen again. *Id.* at ¶ 26.

### F.    *Riess LeMieux's Acknowledgment, Apology and Prevention Plan.*

Riess LeMieux understands the significance of the errors in the Joint Opposition and this Honorable Court's Order. Immediately upon receiving the Court's Order, Riess LeMieux conferred with Jones Fussell – first with Tom Huval, who did not draft the pleading and could not provide any insight regarding whether AI was used, and then with both Tom Huval and John Walker. *Id.* at ¶ 27. It was during the second conversation that John Walker admitted for the first time, he used AI to draft the Opposition. *Id.* at ¶ 27. Thereinafter, Ms. Lambert sent an email to all attorneys at Riess LeMieux informing them that she and Mr. Riess were ordered to show cause for use of AI in pleadings, provided the facts, and cautioned the lawyers to be diligent with working with co-counsel or making any joint filings. Ex. "3," Lambert Decl. at ¶ 31. Further, Riess LeMieux engaged in a detailed review of the contents of the Opposition considering the Court's Order, and it agrees with the Court. Ex. "3," Lambert Decl. at ¶ 33.

Riess LeMieux plans to conduct mandatory training for all of its attorneys on Rule 11 and the use of artificial intelligence in legal research in the next 60 to 90 days. Ex. "2," Riess Decl. at ¶ 29. Riess LeMieux let its guard down and its judgment was blurred by its limited role preparing the Joint Opposition and its good-faith reliance on Jones Fussell based on prior working relationships and reputation and knowledge of the issues before the Court in the subject litigation. Ex. "2," Riess Decl. at ¶¶ 17 and 31.

G.    *Respondents Offered to Pay Defense Counsels' Related Fees.*

Following the Court's Show Cause Order, Respondents reached out to Defense Counsel to offer to pay the fees associated with researching the "hallucinated" cases in the Joint Opposition. Ex. "2," Riess Decl. at ¶ 33.  Defense Counsel advised that the time they spent regarding the research and analysis was not segregated; therefore, he was unable to provide this breakdown.  Ex. "2," Riess Decl. at ¶ 33.

H.    *Respondents Have Never Been Sanctioned.*

Respondents take their duties as officers of the Court seriously.  Michael Riess has practiced law for 42.5 years handling contentious complex, multi-party litigation and has never been sanctioned at the state or federal level or been the subject of a disciplinary action before the Louisiana State Bar Association.  Ex. "2," Riess Decl. at ¶ 34.  Liz Lambert has practiced law for 15 years as a civil litigator and likewise has never been sanctioned at the state or federal level or been the subject of disciplinary action before the Louisiana State Bar Association.  Ex. "3," Lambert Decl. at ¶ 36.  The issues before the Court are not indicative of who Michael and Liz are as attorneys, or how they practice.  The Respondents assure the Court that this will not happen again.  Respectfully, the Respondents urge that considering their involvement in the captioned matter and the remedial measures they have taken to prevent a similar incident in the future, they should not be sanctioned.

II.    **Rule 11 Sanctions of the Respondents
        Are Not Warranted in this Situation.**

Respondents acted reasonable under the circumstances by reviewing the brief and checking citations contained in the Joint Opposition filed on behalf of Plaintiffs in the captioned matter, and raising the issue of cases not found in Defendant's brief with co-counsel before the Joint Opposition was filed.  At no time did Respondents utilize artificial intelligence tools or have

knowledge of the use of artificial intelligence tools to draft the Joint Opposition.  Instead, the Respondents did rely on their longstanding relationship with co-counsel and were entirely without any knowledge of co-counsel's use of artificial intelligence when they reviewed the draft opposition.

### A. Sanctions Under Rule 11(b)(2) Are Not Warranted Here; Respondents Acted Reasonable Under the Circumstances.

Under Rule 11(b)(2)of the Federal Rules of Civil Procedure,

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: … (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]

Similarly, a "signature certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive." *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 542 (1991).  Pursuant to Rule 11(c)(1), "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."

In determining whether an attorney has satisfied his or her obligations under Rule 11, the "standard with which an attorney is measured is an objective, not subjective, standard of reasonableness under the circumstances." *See, e.g.*, *Jenkins v. Methodist Hospitals of Dallas, Inc.*, 478 F.3d 255, 264 (5th Cir. 2007); *Whitehead v. Food Max of Mississippi, Inc.*, 332 U.S. 796, 802 (5th Cir.) (en banc), *cert denied*, 540 U.S. 1047 (2003)(quoting *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1024 (5th Cir. 1994)).  "Reasonableness is reviewed according to the

'snapshot' rule, focusing upon the instant the attorney affixes his signature to the document." *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444 (5th Cir. 1992). Further, courts also consider other factors, including "the time available to the signer for investigation" and "the feasibility of a prefiling investigation." *Cordova v. Univ. Hosp. & Clinics, Inc.*, 92 F.4th 266, 276 (5th Cir. 2024), *cert. denied sub nom. Mire v. Univ. Hosp. & Clinics, Inc.*, 144 S. Ct. 2608 (2024).

### 1. Respondents' Review and Revisions to the Joint Opposition Was Reasonable Under the Circumstances.

Respondents' actions weighs in favor of finding their conduct to be reasonable under the circumstances. Respondents did not abdicate or impermissibly delegate their obligations under Rule 11(b)(2) in working with experienced co-counsel to prepare the Joint Opposition. Respondents reviewed and edited the draft opposition after reading the Defendants' brief with the understanding and agreement that experienced co-counsel was taking the lead role in drafting the argument. And in evaluating that reasonableness, the Advisory Committee's Comments are instructive.

Pursuant to the Advisory Committee's Comments to Rule 11, "what constitutes a reasonable inquiry may depend on such factors as how much *time for investigation was available to the signer*; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he *depended on forwarding counsel or another member of the bar.*" Rule 11, Advisory Committee Notes to 1983 Amendment (emphasis added). Applying some of the above factors, the Fifth Circuit concluded that attorneys were reasonable in relying on and verifying work done by prior counsel considering, in part, the time constraints to file the pleading at issue. *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 447 (5th Cir. 1992). That analysis is relevant here.

14

In *Smith*, a plaintiff retained an out of state attorney, who specialized in the area of the law at issue, to investigate a potential RICO claim based on the plaintiff's employment termination. *Id*. at 442.  After the out of state counsel compiled reports based on interviews with multiple potential witnesses, the plaintiff hired a local attorney to draft and file a complaint two months before the prescriptive period expired.  *Id*.  In drafting the complaint, the new counsel relied on the prior counsel's reports and conducted its own investigation of the plaintiff's claims.  *Id*.  In reversing the district court's sanctions, the Fifth Circuit stated that "the attorneys' investigation, while not perfect, was reasonable under the circumstances."  *Id*. at 444.  The Court noted that the new attorneys were "entitled to place some reliance upon" the prior attorney's work under the circumstances.  *Id*. at 446.  *See also Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 732 F. Supp. 2d 653, 675 (N.D. Tex. 2010) (citing *Smith*, *supra*, the district court refused to impose sanctions on multiple attorneys for relying on their co-counsel's work, where the co-counsel had assumed the lead role in deciding how to pursue the client's claims.).

By way of another example, in *U.S. v. Cohen*, the Court declined to impose sanctions where counsel cited cases he believed were provided another attorney with a renowned legal reputation. 724 F. Supp. 3d 251, 259 (S.D.N.Y. 2024).[11]  In *Cohen*, defense counsel consulted his client, also an attorney, in drafting the pleading at issue. *Id*. at 254.  After review and consultation with a third attorney, the client sent multiple cases to his defense counsel that were "hallucinated" by A.I. *Id*. Believing the cases came from the client's consulting attorney, who had a renowned legal reputation in the community, the defense counsel included them in the pleading without verification. *Id*. at 255. Upon realizing his mistake, the defense counsel explained he was unaware

---

[11] Respondents acknowledge that the standard applied by the Court in *Cohen*, *supra*, is a subjective bad faith standard, but the analysis is still helpful in providing a framework for consideration of the issues here.

of the use of A.I. and apologized to the court. *Id*. Considering the facts of the case, the Court did not impose sanctions on defense counsel. *Id*. at 259.

Here, at the direction of the clients, co-counsel had assumed the lead role in preparing the Joint Opposition. It is common practice for lawyers serving as co-counsel representing either the same client or clients with aligned interests, to divide responsibility for drafting tasks. Lawyers do this for various reasons, including to allow co-counsel with particular expertise in the relevant area to "take the lead"; to allow co-counsel with more time and availability to take principal responsibility for drafting; and/or, to allow their joint or aligned clients to reduce legal fees.

Respondents received a draft of the opposition the day before it was due and reviewed the draft and provided revisions to co-counsel prior to its filing. Unbeknownst to Respondents, artificial intelligence was utilized. Respondents believed citations included in the draft were held over from another brief. Respondents revised the brief to remove those cases and reported same to co-counsel. Admittedly, Respondents did not review all of the cases cited as a result of Respondents' scope as discussed and agreed to by co-counsel and the Plaintiffs. Not until last week did Respondents have knowledge that artificial intelligence was used to prepare the Joint Opposition. Had Respondents known that co-counsel used artificial intelligence, Respondents would not have permitted their names to be affixed to the pleading.

Unlike the circumstances in *Shelton v. Parkland Health* where counsel was unreasonable for blindly relying on a newly admitted attorney,[12] Respondents did not rely on a newly admitted attorney, but rather relied on a lawyer with more than four decades of experience with whom they have worked with for years. In *Shelton*, the district court in the Northern District of Texas determined that an attorney violated Rule 11(b) by unknowingly filing a brief containing

---

[12] 2025 WL 3141108, at *3.

"hallucinated" cases that was draft by a newly admitted associate without checking of the citations. No. 3:24-CV-2190-L-BW, 2025 WL 3141108, at *3 (N.D. Tex. 11/10/25)("While [the sanctioned counsel] acknowledges that she did not check 'each of the citations', she does not assure the Court that she checked *any* of them." (internal citations omitted)).   The Court determined that that counsel was unreasonable because "at least some attention to the legal citations was called for" considering the circumstances of relying on a newly admitted attorney.  *Id.*  As a result the Court, "utilizing the … least severe sanction adequate …" admonished counsel as her conduct was not malicious. *Id.* at *5.

Here, Respondents assure the Court that they did, in fact, review the draft opposition. Admittedly and unfortunately, they did not check the citations, but instead relied on their experienced co-counsel to include the proper legal authority in an area of law for which they have significant experience.

Further, Respondents retained prominent legal ethics expert, Dane Ciolino, to offer his opinions regarding Respondents' conduct for the Court's consideration. Affidavit of Dane S. Ciolino, dated 2/11/26, attached as Exhibit "1." Mr. Ciolino opined that, under Rule 11, Respondents acted reasonable under the circumstances. *Id.* at ¶¶ 39 to 41. In reaching his opinion, Mr. Ciolino specifically relied on the following facts: the common practice of dividing labor by co-counsels, which was done at Respondents' client's request; the limited scope of Respondents' role in drafting the Joint Opposition and Jones Fussell's expertise based on Respondents' prior experience; Rule 11's Advisory Committee Comment that expressly notes that dependence on "another member of the bar" is a factor bearing on the reasonableness of a lawyer's conduct; and the review that was actually performed by Respondents given the time constraints to do so. *Id.*

2.      Respondents' Acted Reasonable Under the
        Circumstances Considering Their Lack of
        Knowledge of the Use of Artificial Intelligence
        and the Division of Labor.

In its Order and Reasons,[13] the Court notes that Plaintiffs did not seek leave to file a sur-reply to correct the numerous falsehoods in the brief or apologize for the errors. Respondents sincerely apologize to the Court, Defendants and Defense Counsel. The errors and falsehoods should not have been present in the Joint Opposition. As Respondents had a limited role, they did not read the Reply since the matter was submitted to the Court at that time, the Respondents were unaware of the use of artificial intelligence until after this Court issued the February 5, 2026 Show Cause Order[14] and Order and Reasons.[15]

After review of the Court's orders, Respondents contacted Jones Fussell and it was explained – for the first time – that Mr. Walker utilized A.I. to draft the Joint Opposition. Prior to that time, Respondents had no reason to believe artificial intelligence was used. During Ms. Lambert's review of the Joint Opposition, she understood the cases attributed to Defendants' argument to be cases held over from another brief. Prior to the Court's Order, at no time did Respondents suspect that that any citations in the *Joint Opposition* were "hallucinated" or erroneous. Accordingly, under these particular circumstances, Respondents took reasonable steps to fulfill their Rule 11(b)(2) obligation. Ex. "2," Ciolino Aff. at ¶¶ 39 to 41.

---

[13] Rec. Doc. 101.

[14] Rec. Doc. 103.

[15] Rec. Doc. 101.

3.    Respondents Understand the
Significance of This Court's Order and
<u>Take Responsibility for Their Actions.</u>

Riess LeMieux understands the significance of this Honorable Court's Order.  Immediately upon receiving it, Riess LeMieux conferred with Jones Fussell – first with Tom Huval, who did not draft the pleading and could not provide any insight regarding whether AI was used, and then with both Tom Huval and John Walker.  It was during the second conversation that John Walker admitted for the first time, he used AI to draft the Opposition.  There were no prior instances of the use of generative artificial intelligence to conduct legal research; nothing to put Respondents notice that the *Joint Opposition* contained "hallucinated" or erroneously cited cases.  Thereinafter, Liz Lambert sent an email to all attorneys at Riess LeMieux informing them that she and Michael Riess were ordered to show cause for use of AI in pleadings, provided the facts, and cautioned the lawyers to be diligent with working with co-counsel or making any joint filings.[16]  Further, Riess LeMieux engaged in a detailed review of the contents of the Opposition in light of the Court's Order, and agrees with the Court.

Further, within the next 60 to 90 days, Riess LeMieux plans to conduct mandatory training for all of its attorneys on Rule 11 and the use of artificial intelligence in research and drafting briefs.  Riess LeMieux will not rely on its experience with co-counsel without verifying the substance of the briefs in the future.

---

[16] Further, at the time the Joint Opposition was drafted, the Reiss LeMieux firm had a verbal policy against the use of generative artificial intelligence to conduct legal research.

B.    *Riess LeMieux has Already and Will Continue*
       *to Implement the Remedial Measures to Ensure*
       <u>*This Will Not Happen Again.*</u>

Riess LeMieux has already begun to suffer harm as a result of Respondents' conduct. This matter has been reported locally and nationally. Aside from the embarrassment and reputational damage already sustained, this has been a learning experience for the Respondents and the firm.

"To serve [the] multiple purposes of Rule 11, the district court should carefully choose sanctions that foster the appropriate purpose of the rule, depending upon the parties, the violation, and the nature of the case." *Thomas*, 836 F.2d at 877. "In considering what form of sanction to impose, the Court may consider: (1) whether the conduct was willful or negligent; (2) whether the activity was isolated or part of a pattern of activity; (3) whether the conduct affected only a single event within the case or the entire litigation; (4) any previous similar conduct by the attorney; (5) whether the conduct was intended to cause injury; (6) the effect of the conduct on the litigation in terms of time and expense; (7) whether the responsible party was trained in the law; and (8) what sanction, given the financial resources of the responsible person, is needed to deter similar activity by other litigants." *SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, 2018 WL 6788033, at *6 (E.D. Tex. Dec. 26, 2018) (citing *Bullard v. Chrysler Corp.*, 925 F. Supp. 1180, 1190 (E.D. Tex. 1996) (in turn citing FED. R. CIV. P. 11 Advisory Committee's note to 1993 amendment)).

Respondents' conduct here was not willful; it was not part of a pattern, but was an isolated event; it pertained to a single event in the case; there was no similar conduct by the Respondents; the Respondents did not intend to cause injury. Moreover, the declarations submitted by Mr. Riess and Ms. Lambert make it perfectly clear that Riess LeMieux has (prior to the Show Cause Order) instituted remedial measures regarding the use of AI, and as importantly, have and continue to take

additional remedial measures in light of and in response to this Court's Show Cause Order. Ex. "2," Riess Decl. at ¶¶ 20 to 22, 24, 25, 26, 29, and 32 to 33; Ex. "3," Lambert Decl. at ¶¶ 23, 24 to 26, 28, 29, 32, and 35. These remedial measures, again implemented both prior to the issuance of this Honorable Court's Show Cause Order and after, can be summarized as follows:

1. At the time that the Opposition and Reply were filed, Riess LeMieux was not using AI. After a software update, an AI component was added to Microsoft Teams (a product Riess LeMieux uses) for recording and transcription; however, Riess LeMieux issued a firm policy to all employees to disable that feature to maintain privilege and to ensure client information was not accessible to third parties or to have an "open" AI system. Ex. "2," Riess Decl. at ¶ 20.

2. Beginning in 2025, Riess LeMieux squarely addressed the use of AI and how to implement it safely as discussed as Riess LeMieux partner. *Id*. at ¶ 21.

3. In October 2025, Joel Hron, Chief Technology Officer at Thompson Reuters, made a presentation to Riess LeMieux on how to implement and use Westlaw AI for research and drafting. *Id*. at ¶ 22.

4. Certain attorneys at Riess LeMieux have been trained on how to use Westlaw Co-Counsel, Westlaw Deep Research, and Microsoft Co-Pilot as research tools in their practice. *Id*. at ¶ 24.

5. Riess LeMieux has been working on an AI policy in draft form prior to the issuance of the Show Cause Order, which AI policy will be implemented in the next 4 to 6 weeks. *Id*. at ¶ 25.

6. Riess LeMieux's AI policy will now include a provision for documents drafted by co-counsel, certifications for primary drafters, and a process for review to confirm accuracy. *Id.* at ¶ 26.

7. Riess LeMieux will conduct mandatory training for all Riess LeMieux attorneys on Rule 11 and the use of AI in research and drafting in the next 60 to 90 days. *Id.* at ¶ 29.

8. Riess LeMieux is going to take the affirmative steps to make sure this type of similar issue never happens again. *Id.* at ¶ 32.

9. In an attempt to mitigate any damage caused by the filing of the Opposition, Mr. Riess reached out to Defense Counsel and requested that he provide a breakdown of the time spent in analyzing and researching the cases cited in the Opposition that are the subject of this Honorable Court's Show Cause Order. Defense Counsel advised that the time spent regarding the research and analysis was not segregated; therefore, he was unable to provide this breakdown. *Id.* at ¶ 33.

If required by this Honorable Court, Riess LeMieux shall be happy to provide an updated status report via an affidavit on the measures implemented and to be implemented to educate Respondents and its employees on the use of artificial intelligence and to avoid an event like this from occurring again.

## III. <u>Conclusion.</u>

The Respondents unconditionally apologize for the fact that the Joint Opposition was submitted with A.I. hallucinated citations, and they have taken immediate, remedial steps to prevent future instances and to ensure that protocols are implemented avoiding such risks again in

the future.  They stand ready to appear before the Court on February 24, 2026, and to supplement this submission with any additional information the Court may request.

Respectfully submitted,

*/s/ Steven F. Griffith, Jr.*
STEVEN F. GRIFFITH, JR. (La. No. 27232)
MATTHEW S. CHESTER (La. No. 36411)
BRIAN M. BALLAY (La. No. 29077)
MYLES H. SONNIER  (La. No. 39345)
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
sgriffith@bakerdonelson.com
mchester@bakerdonelson.com
bballay@bakerdonelson.com
msonnier@bakerdonelson.com

**ATTORNEYS FOR
MICHAEL R. C. RIESS AND
JOHANNA ELIZABETH LAMBERT**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 12th day of February, 2026, the foregoing document was electronically filed with the Clerk of the Court using the ECF system, which will send notice of electronic filing to all counsel of record.

/s/ *Steven F. Griffith, Jr.*
STEVEN F. GRIFFITH, JR.